Filed 1/22/26  P. v. Briles CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>THOMAS PAUL BRILES,<br><br>    Defendant and Respondent. | G065030<br><br>(Super. Ct. No. 19NF2986)<br><br>O P I N I O N |

            Appeal from an order of the Superior Court of Orange County, Lewis W. Clapp, Judge. Affirmed.

            Todd Spitzer, Orange County District Attorney, and Austin Deuel, Deputy District Attorney, for Plaintiff and Appellant.

            Law Offices of John D. Barnett and John D. Barnett and Albert A. Newton, for Defendant and Respondent.

Defendant Thomas Briles was charged with two counts of driving under the influence of a controlled substance causing bodily injury, with an enhancement for paralyzing one of the victims. At trial, the evidence established Briles had methamphetamine in his system when he ran a red light and crashed his pickup truck into the victims. The only disputed issue was whether the methamphetamine rendered Briles under the influence for purposes of the charged offenses. As to that issue, the prosecution relied on several factors, including Briles's poor performance on various field sobriety tests (FSTs) administered to him following the accident.

The jury convicted Briles as charged, but following the verdict he hired a new attorney and moved for a new trial based on a declaration from a doctor who performed a hip replacement on Briles several years after the accident (and several years prior to trial). The doctor declared that, at the time of the accident, Briles was suffering from a chronic hip problem that physically prevented him from performing well on the FSTs. In seeking a new trial, Briles argued the doctor's declaration constituted newly discovered evidence and his trial attorney was ineffective for failing to call the doctor as a witness at trial.

Due to the death of the trial judge, the matter was heard by Judge Lewis W. Clapp, who granted Briles a new trial on both grounds asserted in his motion, as well as Briles's due process right to a fair trial.

The District Attorney appeals on two grounds. First, as a procedural matter, he contends that because Judge Clapp did not preside over the trial, he could not properly rule on whether defense counsel was ineffective. Second, addressing the merits of the motion, the District Attorney contends Judge Clapp abused his discretion in finding Briles was entitled to a new trial.

We agree Judge Clapp erred in ruling on Briles's ineffective assistance of counsel claim. However, we find Judge Clapp did not abuse his discretion when he granted a new trial based on the new evidence from Briles's doctor and the need to ensure Briles received a fair trial. The California Supreme Court has made clear that, where a trial court finds asserted newly discovered evidence is so material that its absence at trial deprived the defendant of his constitutional right to a fair trial, the court has discretion to grant a new trial, even if the evidence was known, or with reasonable diligence could have been known, at the time of trial. With that principle in mind—and in light of Judge Clapp's conclusion, after a long and thoughtful hearing on the issue, that Briles did not receive a fair trial absent the doctor's opinion regarding the debilitating effects of his hip injury—we cannot say Judge Clapp abused his discretion by granting Briles a new trial. We therefore affirm the new trial order.

FACTUAL AND PROCEDURAL BACKGROUND

I.

THE UNDERLYING TRIAL

On August 15, 2018, shortly after 5:00 p.m., Briles was driving his heavy-duty pickup truck about 40 miles per hour when he entered a busy intersection in Fullerton against a traffic light that had been red for several seconds. Briles collided with two cars before striking a pedestrian in the intersection. The driver of one of the cars was hospitalized for multiple injuries, and the pedestrian suffered a traumatic brain injury and paralysis.

Fullerton Police Corporal Scott Flynn, a certified drug recognition expert, responded to the scene and contacted Briles while he was seated in his truck. Briles did not have any visible injuries or smell of alcoholic beverages and he denied being on any medication or using drugs, but his eyes

3

were bloodshot and watery and his eyelids were droopy. When Briles exited his truck, Flynn noticed his hands and fingers were jittery and he walked with a limp. Briles told Flynn the limp was from having surgery on his right hip when he was younger. He said the surgery had left screws in his hip, which had been bothering him lately. In fact, Briles said that, over the past month, he had been seeing a doctor about undergoing hip replacement surgery.

Flynn directed Briles to the sidewalk, where he administered a series of FSTs to him.[1] The first test was the "modified Romberg test," which required Briles to stand at attention, tilt his head back with his eyes closed, and estimate when 30 seconds had passed. Briles had no difficulty maintaining his balance during the test, but he remained jittery and estimated 43 seconds as 30 seconds.

The next test was the "one-leg stand," which required Briles to stand on one foot for 30 seconds while keeping his legs straight, his arms at his side, and counting forward from 1,000. While standing on his right foot, Briles swayed from side to side, used his arms for balance, and was unable to keep his foot up for the full 30 seconds. The same thing happened when he did the test while standing on his left foot.

Lastly, on the "walk-and-turn" test, Briles had difficulty remembering the directions Flynn gave him for the test. He also failed to take the correct number of steps, walk in a straight line, and step in heel-to-toe fashion, as instructed.

---

[1] The tests were recorded on Flynn's body camera and shown to the jury in conjunction with Flynn's testimony regarding them.

After completing the tests, Briles told Flynn his poor performance was due to his hip injury. But Flynn did not believe him. At trial, he opined Brile's "overall performance [on the tests] was not due to some type of injury."

In addition to struggling on the FSTs, Briles exhibited several physical symptoms that Flynn associated with drug impairment, such as constricted pupils, elevated pulse, muscle twitches, and the aforementioned jitteriness. Briles also mumbled some of his words and had some difficulty answering Flynn's questions about what time it was, where he was, and whether he ate anything after the accident. Moreover, Flynn concluded Briles's limp was intermittent; sometimes he walked with a limp while at the scene, and other times he did not. Based on all these circumstances, Flynn arrested Briles for driving under the influence of a controlled substance.

At the police station, Briles reported having pain in his right hip before Flynn readministered the same three FSTs he had given him at the scene of the accident. Briles fared no better on the tests the second time around, and he had some difficulty performing the additional finger-to-nose test. A sample of his blood was drawn and subsequently determined to contain 409 nanograms per milliliter of methamphetamine, which is above the range for therapeutic usage.

The trial was not conducted until the fall of 2023, five years after the accident. Both sides presented expert testimony on the central question whether Briles was under the influence of a controlled substance at the time of the accident. The experts all agreed that, by itself, the amount of methamphetamine found in Briles's system could not provide the answer to

that question because, unlike a person's blood alcohol level, "blood drug level cannot predict impairment."[2]

The experts disagreed, however, on whether Briles's performance on his FSTs was indicative of impairment. That issue was explored through hypothetical questions that asked the experts to assume various facts that were elicited during the trial, including facts pertaining to Briles's hip injury.

For example, the prosecutor's hypothetical question to Orange County crime lab forensic scientist Jennifer Jiminez asked her to assume the person described in the hypothetical "had metal and screws in his hip from a prior surgery" and had complained of hip pain before performing poorly on his FSTs. Jimenez initially opined the person would be impaired by methamphetamine for purposes of operating a motor vehicle. But she later admitted her opinion could change if the person's poor performance was due to a prior hip problem.

The hip issue also came up during defense counsel's cross-examination of the prosecution's drug recognition expert, Devin Chase. In response to counsel's hypothetical question about whether a person's poor performance on the one-leg stand test would be indicative of impairment if he had "a bunch of screws and bolts" in his hip, Chase answered, "If I were doing that eval, I would discount that specific result."

Defense experts Stefan Rose and Okorie Okorocha went even further when defense counsel asked them a hypothetical question that

_____

[2] According to the expert testimony, a defendant's blood methamphetamine level is not a reliable indicator of impairment because, among other things, it does not reveal when, how much, or in what form the drug was ingested, or whether it had penetrated the defendant's brain so as to affect his ability to safely operate a motor vehicle.

included the assumption that the person disclosed a history of pain and problems with his hip before performing poorly on his FSTs. Based on all of the circumstances encompassed in the question, Rose testified there would be "absolutely no way to tell" whether the person was driving under the influence of a controlled substance, and Okorocha opined the person would not be under the influence.

Also, contrary to what the prosecution's expert witnesses said on the topic, Rose, Okorocha, and a third defense expert, Dr. Adam Kaye, opined that Briles's physical symptoms—elevated pulse rate, pupil size, muscle twitches, and jitteriness—were not indicative of methamphetamine impairment. In assessing Briles's condition and reactions to Flynn's questions, they emphasized it was important to consider he had just been in a high-speed accident in which a person was seriously injured.

During closing argument, the prosecutor acknowledged that Briles told Corporal Flynn his inability to perform the FSTs was due to his hip injury. But the prosecutor also argued Briles lacked credibility because he lied to Flynn about not using drugs. The prosecutor argued Briles failed the FSTs not because he was physically impaired, but because he was under the influence of methamphetamine.

In the end, the jury convicted Briles of two counts of driving under the influence causing bodily injury. (Veh. Code, § 23153, subd. (f).) It also found one of his victims sustained great bodily injury in the form of brain injury or paralysis. (Pen. Code, § 12022.7, subd. (b).)

## II.

### THE NEW TRIAL MOTION

Sentencing was scheduled for November 17, 2023. On that date, however, Briles relieved his trial attorney Andrew Stein and retained John

7

D. Barnett to represent him. Barnett subsequently moved for a new trial on multiple grounds, including newly discovered evidence and ineffective assistance of counsel for failing to present that evidence at trial. The allegedly newly discovered evidence consisted of the declaration from Dr. Michael Gerhardt, who performed hip replacement surgery on Briles in November 2020, which was two years after the accident but nearly three years before Briles's trial.

In his declaration, Dr. Gerhardt stated Briles first had hip surgery in the 1990's, when he was 16 years old, following a motorcycle accident. According to Dr. Gerhardt, the surgical outcome was satisfactory for many years, but Briles's condition deteriorated over time, and by the time of his hip replacement surgery in November 2020, he walked with a limp and "was beset with pain and disability in the right thigh and hip."

Having reviewed the trial testimony in this case, Dr. Gerhardt opined Briles's poor performance on his FSTs was attributable to his preexisting hip injury, not his methamphetamine use. In fact, Dr. Gerhardt opined the hip injury debilitated Briles to the point where he would have been unable to pass his FSTs even if he were "wholly unimpaired" by any drug or substance.

Barnett submitted Dr. Gerhardt's declaration to the trial court in connection with his new trial motion. Barnett did not, however, submit a declaration from trial counsel Stein or present any evidence he attempted to obtain a declaration from Stein. Nor did Barnett submit a declaration from Briles to support his claim that Stein was remiss for failing to call Dr. Gerhardt as a trial witness.

By the time of the hearing on Briles's motion in October 2024, the trial judge had passed away and Judge Clapp had been assigned to the case

for all purposes.[3] Over the course of the lengthy motion hearing, Judge Clapp questioned whether the information in Dr. Gerhardt's declaration constituted new evidence. Judge Clapp pointed out that Briles obviously had personal knowledge of the surgery described in the declaration, and the police reports and trial evidence made clear Briles told the police he had an injured hip and was contemplating hip replacement surgery when they interviewed him at the scene.

Given those circumstances, Judge Clapp inferred Stein must have known about Briles's hip problem and that Dr. Gerhardt had performed surgery on him following the accident, and therefore that information could not be considered new. However, Judge Clapp had a different take on Dr. Gerhardt's opinions regarding the extent of Briles's hip injury and its effect on Briles's ability to perform the FSTs. Describing those opinions as a "new level of evidence," Judge Clapp ruled they were sufficient to warrant a new trial.

On the related issue of whether Stein was ineffective for failing to call Dr. Gerhardt as a witness at trial, Judge Clapp recognized it was possible Stein had spoken to Dr. Gerhardt and determined he would not be a helpful witness for the defense. Nevertheless, irrespective of the reasons for Stein's trial decisions, Judge Clapp ultimately found that, on its face, the information contained in Dr. Gerhardt's declaration was so favorable to the defense that Stein's failure to call Dr. Gerhardt as a witness constituted ineffective assistance of counsel and deprived Briles of due process and a fair

---

[3] Judge Clapp was not a stranger to the case. Months before the case was assigned to him for all purposes, he presided over Briles's pretrial motions to dismiss the case and to suppress evidence. (Pen. Code, §§ 995, 1538.5)

trial. Judge Clapp cited those reasons as an additional basis for granting Briles a new trial.

DISCUSSION

The District Attorney contends Judge Clapp was not the "appropriate authority" to rule on Briles's ineffective assistance of counsel claim, because he "did not preside over the trial and was not possessed of any unique insight into the claim." In addition, the District Attorney asserts Judge Clapp abused his discretion on the merits in granting the new trial motion. For the reasons explained below, we agree with the District Attorney that Judge Clapp erred in considering and granting Briles's motion for a new trial based on ineffective assistance of counsel. But we discern no abuse of discretion in Judge Clapp's decision to order a new trial based on newly discovered evidence and the need to ensure Briles received a fair trial.

I.

THE LAW AND STANDARD OF REVIEW GOVERNING NEW TRIAL MOTIONS

Penal Code section 1181 authorizes the trial court to grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (*Id.*, subd. 8.)

To obtain a new trial based on newly discovered evidence, the defendant must show ""'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." . . . [¶] "Applications on this ground are addressed to the discretion of the court below, and the action of the court below will not

10

be disturbed except for an abuse of discretion.""" (*People v. Martinez* (1984) 36 Cal.3d 816, 821 (*Martinez*).)

In *People v. Fosselman* (1983) 33 Cal.3d 572 (*Fosselman*), the California Supreme Court ruled trial courts may also grant a new trial based on ineffective assistance of defense counsel. (*Id.* at p. 582.) Although there is no statutory authorization for granting a new trial on that basis, *Fosselman* held trial courts may do so as part of their "constitutional duty . . . to ensure that defendants be accorded due process of law." (*Ibid.*)

That holding was grounded in practical considerations. In support of its decision to allow trial courts to grant new trials based on ineffective of assistance of counsel, *Fosselman* stated, "It is undeniable that trial judges are particularly well suited to observe courtroom performance and to rule on the adequacy of counsel in criminal cases tried before them. [Citation.] Thus, in appropriate circumstances justice will be expedited by avoiding appellate review, or habeas corpus proceedings, in favor of presenting the issue of counsel's effectiveness to the trial court as the basis of a motion for new trial. If the court is able to determine the effectiveness issue on such motion, it should do so." (*Fosselman, supra,* 33 Cal.3d at pp. 582–583.)

On appeal, an order granting a motion for a new trial based on ineffective assistance of counsel is reviewed for an abuse of discretion. (*People v. Callahan* (2004) 124 Cal.App.4th 198, 209 (*Callahan*); *People v. Andrade* (2000) 79 Cal.App.4th 651, 659–660 (*Andrade*).) The justification for applying that deferential standard of review is the same as for allowing such motions in the first place: Having personally observed defense counsel in action throughout the trial, the trial court is in the best position to determine

11

whether counsel's performance was defective and, if so, whether the defendant was prejudiced by counsel's failings. (*Ibid*.)

## II.

### JUDGE CLAPP SHOULD NOT HAVE CONSIDERED BRILES'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

It is undisputed Judge Clapp had the legal authority to consider Briles's motion for a new trial. Indeed, because the judge who presided over the trial died following the verdict, Judge Clapp was obligated to hear the motion after the case was assigned to him. (Code Civ. Proc., § 661; *Telefilm, Inc. v. Superior Court* (1949) 33 Cal.2d 289, 292.)

However, that does not mean it was appropriate for Judge Clapp to adjudicate the merits of every aspect of the motion. As noted above, the holding in *Fosselman* to permit new trial motions based on ineffective assistance of counsel was rooted in practical considerations. (*Fosselman, supra*, 33 Cal.3d at pp. 582–583.) Following *Fosselman*, the Supreme Court explained, "[B]y this holding we sought to expedite justice . . . . We did not suggest that a motion for new trial will always be the perfect vehicle to argue ineffectiveness of counsel [claims], only that it is *available*." (*People v. Smith* (1993) 6 Cal.4th 684, 693.) "[O]ur assumption has been that [trial] courts would decide such claims in the context of a motion for new trial *when the court's own observation of the trial* would supply a basis for the court to act expeditiously on the motion." (*People v. Cornwell* (2005) 37 Cal.4th 50, 101, italics added, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; accord, *People v. Carrasco* (2014) 59 Cal.4th 924, 981–982.)

That circumstance did not exist in this case. Because Judge Clapp did not preside over Briles's trial, he did not witness defense counsel's

12

performance or possess any special insight into the case. Therefore, Judge Clapp was not in a position to expedite justice by ruling on Briles's ineffective assistance of counsel claim. *Fosselman*'s rationale for allowing trial judges to adjudicate such claims in the context of a new trial motion simply does not apply here.

Our analysis of this issue might be different if Briles's motion had been supported by a declaration or testimony from Stein explaining why he did not call Dr. Gerhardt as a witness at trial. But Briles did not present any evidence of the reasons for, or the reasonableness of, Stein's trial tactics. Therefore, Judge Clapp was no better situated than any other judge to assess the effectiveness of Stein's trial performance. That being the case, Judge Clapp should have refrained from deciding whether Stein's failure to call Dr. Gerhardt as a witness constituted ineffective assistance of counsel so as to justify a new trial.

As we explain in the next section, that would not have left Briles without a means to pursue his ineffective assistance of counsel claim. It simply would have required him to bring the claim by way of a petition for writ of habeas corpus, which is the preferred method for adjudicating such claims. (See *People v. Watts* (2018) 22 Cal.App.5th 102, 118 [a petition for habeas corpus, not a new trial motion, is the proper vehicle for raising an ineffective assistance of counsel claim based on matters outside the record if defendant does not provide a declaration from counsel on the issue].)

III.

JUDGE CLAPP ABUSED HIS DISCRETION IN GRANTING BRILES A NEW TRIAL BASED ON INEFFECTIVE ASSISTANCE OF COUNSEL

"A criminal defendant's federal and state constitutional rights to counsel [citations] include the right to *effective* legal assistance." (*People v.*

*Mai* (2013) 57 Cal.4th 986, 1009.) A defendant alleging ineffective assistance of counsel must demonstrate "both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623.)

The procedural rules for bringing an ineffective assistance of counsel claim are well established. "'[E]xcept in those rare instances where there is *no conceivable tactical purpose* for counsel's actions,' claims of ineffective assistance of counsel generally must be raised in a petition for writ of habeas corpus . . . ." (*People v. Salcido* (2008) 44 Cal.4th 93, 172, italics added.) That way, the reasoning behind counsel's decisions can be explored through the presentation of additional evidence. (*Id.* at p. 152; *People v. Jasso* (2025) 17 Cal.5th 646, 695–696.) Absent such evidence, a court should not set aside a jury verdict and brand defense counsel incompetent simply because counsel's tactics have been called into question. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267.)

In this case, the trial record contains no indication why attorney Stein did not call Dr. Gerhardt as a witness on behalf of the defense. Briles could have filled that evidentiary void by submitting a declaration from Stein as part of his new trial motion. Or he could have called Stein as a witness at the motion hearing to give Judge Clapp a factual basis to assess the reasonableness of Stein's trial decisions. But Briles did not do either, leaving Judge Clapp with insufficient information to resolve his ineffective assistance of counsel claim.

Under these circumstances, the only way Judge Clapp could have found Stein ineffective was if there was no conceivable tactical reason for

14

Stein to forgo calling Dr. Gerhardt as a trial witness. (*People v. Salcido, supra,* 44 Cal.4th at p. 172.) But, as Judge Clapp noted, there was in fact a conceivable tactical reason for not putting Dr. Gerhardt on the witness stand: Stein may have talked to the doctor and realized he would not have made a good witness for the defense. After all, not all declarants make good trial witnesses.

Therefore, Judge Clapp could not properly grant a new trial based on ineffective assistance of counsel. His decision to do so amounts to an abuse of discretion because it lacked necessary factual context and was not guided by the legal principles applicable to an ineffective assistance of counsel claim. (See *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977 ["'[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue'"]; *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 ["Action that transgresses the confines of the applicable principles of law is outside the scope of discretion"].)

In arguing otherwise, Briles relies on *Callahan, supra,* 124 Cal.App.4th 198 and *Andrade, supra*, 79 Cal.App.4th 651. Those cases illustrate that appellate courts are generally reluctant to overturn a trial court's decision to grant a new trial based on ineffective assistance of defense counsel. But there is an important distinction between those cases and this one: During the motion hearings in *Callahan* and *Andrade*, the defendants presented affirmative evidence that their attorneys had no rational tactical purpose for their trial decisions, which is a necessary prerequisite to prove ineffective assistance of counsel. (*People v. Mickel* (2016) 2 Cal.5th 181, 198; P*eople v. Wagstaff* (2025) 111 Cal.App.5th 1207, 1223.)

15

In *Callahan*, the evidence presented at the hearing on the new trial motion came from the testimony of multiple witnesses, including defense counsel himself, who was questioned about his trial tactics. (*Callahan, supra,* 124 Cal.App.4th at pp. 205–215.) And in *Andrade,* the defendant presented extensive evidence bearing on the reasonableness of defense counsel's performance. (*Andrade, supra*, 79 Cal.App.4th at pp. 657–662.) Thus, unlike this case, there was a sufficient factual basis to permit the trial courts to assess the effectiveness of defense counsel in *Callahan* and *Andrade*.

Moreover, *Callahan* and *Andrade* both involved the typical situation where the judge hearing the new trial motion had presided over the trial. That circumstance gave the judge unique insight into the motion and was an important consideration in upholding the judge's ruling on appeal. (*Callahan, supra*, 124 Cal.App.4th at p. 211 ["'It is undeniable that trial judges are particularly well suited to observe courtroom performance and to rule on the adequacy of counsel in criminal cases tried before them'"]; *Andrade, supra*, 79 Cal.App.4th at p. 660 ["'the trial court is in the best position to make an initial determination, and intelligently evaluate whether counsel's acts or omissions were those of a reasonably competent attorney'"].) Again, that circumstance is not present here. Thus, although we do not disagree with the results in *Callahan* and *Andrade*, we find both cases distinguishable. Neither decision alters our conclusion that, under the particular circumstances presented here, Judge Clapp abused his discretion by granting Briles a new trial based on ineffective assistance of counsel.

16

## IV.

## JUDGE CLAPP DID NOT ABUSE HIS DISCRETION IN GRANTING A NEW TRIAL BASED ON OTHER GROUNDS

As an additional basis for granting a new trial, Judge Clapp determined the information contained in Dr. Gerhardt's declaration was newly discovered, material, and necessary to ensure Briles received a fair trial. Based on the California Supreme Court's decision in *Martinez, supra*, 36 Cal.3d 816, we discern no abuse of discretion in that ruling.

In *Martinez*, the defendant was charged with burglarizing a tool shop where he used to work and where he thereafter frequently visited as part of his new job. One of the items the burglar had attempted to steal was a drill press that was found outside the shop near a hole in the surrounding fence. Although the police found defendant's fingerprints on the drill press, that discovery was not particularly incriminating given his frequent access to the machine. In fact, defendant testified he had used the drill press just a few weeks before the burglary took place and he was at the shop the day before the burglary occurred. Defendant also presented evidence he was home at the time of the burglary. However, the tool shop's maintenance employee testified he painted the drill press the afternoon before the burglary, which created "the necessary inference that defendant must have touched the machine during the night of the burglary." (*Id.* at p. 820.)

After defendant was convicted of the burglary, he sought a new trial based on the affidavit of Fred Torrez, who was the shop foreperson at the time of the burglary. In his affidavit, Torrez said he spoke to defendant at the shop the day before the burglary and was certain the drill press was not painted that day. Torrez could not recall the exact date the machine was painted, but he knew it was within two weeks of the burglary. He said he did

17

not come forward earlier because he did not understand the painting date was crucial to the case and because he did not want to jeopardize his job at the shop. (*Martinez, supra*, 36 Cal.3d at pp. 820–821.)

The trial court denied the new trial motion, finding the defense failed to use due diligence in trying to locate Torrez and his proposed testimony was not material in the sense it would render a different result probable on retrial. (*Martinez, supra*, 36 Cal.3d at pp. 820–821.) However, the Supreme Court ruled the trial court abused its discretion in refusing to order a new trial. (*Id*. at p. 827.)

Speaking to the materiality requirement, the Supreme Court stated, "Numerous cases hold that a motion for a new trial should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant. [Citations.] The proffered testimony of Torrez that the drill press was not painted the afternoon before the burglary meets this criterion, and reopens the critical gap in the prosecution's chain of proof." (*Martinez, supra*, 36 Cal.3d at p. 823.) The Supreme Court reasoned "[i]f the jurors even found a reasonable possibility that Torrez' testimony was true, it is unlikely that they would find defendant's guilt proved beyond a reasonable doubt." (*Ibid*.) This prospect was sufficient to render Torrez' testimony material for purposes of securing a new trial. (*Id*. at pp. 823–824.)

Turning to the due diligence requirement, the Supreme Court determined it "should have been apparent that [Torrez] might have information critical to the defense of the case." (*Martinez, supra*, 36 Cal.3d at p. 824.) The Court also found the record supported the trial court's finding defense "counsel failed to use reasonable diligence in obtaining Torrez' testimony." (*Id*. at p. 825.)

18

Nevertheless, the Supreme Court stated, "We do not believe . . . this lack of diligence is a sufficient basis for denial of defendant's motion. The requirement of diligence serves 'a public policy which demands that a litigant exhaust every reasonable effort to produce at his trial all existing evidence in his own behalf, to the end that the litigation may be concluded.' [Citations.] That policy, however, itself serves a more fundamental purpose—the determination of guilt and innocence." (*Martinez, supra*, 36 Cal.3d at p. 825.)

"Once a trial court determines that a 'defendant did not have a "fair trial on the merits, and that by reason of the newly discovered evidence the result could reasonably and probably be different on a retrial,"' [citation], it should not seek to sustain an erroneous judgment imposing criminal penalties on the defendant as a way of punishing defense counsel's lack of diligence. . . . The focus of the trial court . . . should be on the significance and impact of the newly discovered evidence, not upon the failings of counsel or whether counsel's lack of diligence was so unjustifiable that it fell below constitutional standards. . . . If consideration of the newly discovered evidence is essential to a fair trial and a just verdict, the court should be able to grant a new trial without condemning trial counsel as constitutionally ineffective." (*Martinez, supra*, 36 Cal.3d at pp. 825–826, fn. omitted.)

In other words, materiality, fairness, and the importance of achieving a just verdict can trump due diligence in some circumstances. Indeed, if, as the Supreme Court found in *Martinez*, the newly discovered evidence could reasonably and probably lead to a different result on retrial, then the failure to grant a new trial constitutes a reversible abuse of discretion, even if the evidence could have been discovered with due diligence before trial. (*Martinez, supra*, 36 Cal.3d at pp. 825–827.)

19

In this context, a "different result" does not mean acquittal. When a defendant moves for a new trial based on newly discovered evidence, he need only show "it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented." (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521.)

The District Attorney attempts to distinguish *Martinez,* arguing the lack of due diligence in that case was attributable to the defendant's attorney and not the defendant himself. The District Attorney contends the situation is different here, because Briles was aware of Dr. Gerhardt's involvement in his hip injury.

In support of this contention, the District Attorney relies on a footnote in *Martinez* in which the Supreme Court stated, "We distinguish those cases in which the lack of diligence is that of the defendant himself, as where the defendant knows of a witness but does not inform his counsel." (*Martinez, supra*, 36 Cal.3d at p. 825, fn. 8.) However, that disqualifying circumstance is not present here.

At the time of trial, Briles certainly knew of Dr. Gerhardt, just as the defendant in *Martinez* knew of Mr. Torrez. But there is nothing to suggest Briles kept this information from Stein. In fact, based on the circumstances presented, Judge Clapp inferred Stein did know about Dr. Gerhardt. That inference was not challenged by the District Attorney below, which is understandable because the evidence presented at trial (as well as the police reports prepared after the accident) clearly revealed that, on the night of the accident, Briles told the officers he had an injured hip, he was contemplating hip replacement surgery, and his hip pain or dysfunction prevented him from performing well on the FSTs. These circumstances, and the obvious importance of Briles's hip injury to the defense, negate the

possibility Stein did not know about Dr. Gerhardt. Therefore, unlike the situation alluded to in the *Martinez* footnote, this is not a case where new trial relief is barred because the evidence showed the defendant failed to alert counsel to a potentially beneficial witness.

The District Attorney also challenges Judge Clapp's finding that the absence of Dr. Gerhardt's testimony undermined Briles's right to a fair trial. As to that issue, the District Attorney does not (indeed, could not reasonably) dispute Dr. Gerhardt's testimony would have squarely refuted the prosecution's evidence that Briles's poor performance on his FSTs was attributable to the influence of methamphetamine. But, according to the District Attorney, Dr. Gerhardt's testimony was not material in the grand scheme of things, because there was other evidence showing Briles was too impaired to safely operate a motor vehicle, such as his physical symptoms and his difficulty answering some of Corporal Flynn's questions at the scene.

This argument might be more persuasive if the prosecutor had not spent a considerable amount of time in her closing argument discussing the FSTs and hammering home her point that Briles's poor performance on them was proof positive he was too impaired by drugs to drive. As a visual accompaniment to her argument, the prosecutor also replayed clips of Briles performing the FSTs, which were originally played during Flynn's testimony. This shows the FST results were a central component of the prosecution's case.

As for the other evidence the prosecution relied on, such as Briles's physical symptoms and behavior at the scene, the defense experts testified at length to why that evidence was *not* indicative of Briles being under the influence. Dr. Gerhardt's testimony would have fortified their

21

opinions and given the jury a different perspective on the issue of impairment.

Dr. Gerhardt's testimony about Briles's hip injury also would have been important in shoring up Briles's credibility. The District Attorney argues Dr. Gerhardt's testimony concerning Briles's injury would have been cumulative because Briles complained of hip problems to Flynn at the scene and the experts were asked to assume the person described in the hypothetical questions had a hip injury. Other than Briles's statements to Flynn about his hip, however, there was no independent evidence to support Briles's assertion he had a hip injury that prevented him from properly performing the FSTs. And even though the prosecutor acknowledged Briles's claim to that effect in her closing argument, she also asserted Briles lacked credibility because he lied about not being on drugs when Flynn asked him about that at the scene. So, without Dr. Gerhart's testimony, the jury could have easily written off Briles's hip complaints as a self-serving attempt to avoid prosecution.

It is true the expert witnesses were asked to assume the person described in some of the hypothetical questions had a hip injury that prevented him from performing the type of FSTs Briles was given at the scene. But the jurors were instructed it was up to them to decide whether the assumed facts in the hypothetical questions were true. If the jurors did not believe Briles had an injured hip, that could very well have affected their consideration of the expert's testimony and their broader understanding of the case.

Beyond establishing the fact of Briles's hip injury, Dr. Gerhardt's testimony also would have helped the jury understand the nature and extent of the injury. Whereas Briles complained generally about having a hip

problem at the scene on the night of the accident, Dr. Gerhardt would have been able to explain from the perspective of a medical expert exactly what the problem was with Briles's hip and how Briles's particular injury precluded him from performing the particular FSTs that were administered. Having personally performed Briles's hip replacement surgery, Dr. Gerhardt was uniquely qualified to testify on that topic.

All things considered, we cannot say Judge Clapp abused his discretion in ordering a new trial. Notwithstanding any issues related to Stein's trial performance or the lack of due diligence in securing Dr. Gerhardt's testimony for trial, there is no basis to disturb Judge Clapp's finding that Dr. Gerhardt's testimony was necessary to ensure Briles received a fair trial and a just verdict was rendered.

## DISPOSITION

The order granting Briles a new trial is affirmed.

GOODING, J.

WE CONCUR:

MOORE, ACTING P. J.

SCOTT, J.